## COLEMAN FURNITURE CORPORATION v. HOME INS. CO. OF NEW YORK.

District Court, W. D. Virginia, at Roanoke. Jan. 31, 1933.

On Motion to Set Aside Verdict April 6, 1933.

John S. Draper and John W. B. Deeds, of Pulaski, Va., and T. X. Parsons, of Roanoke, Va., for plaintiff.

Alexander H. Sands, of Richmond, Va., and Howard C. Gilmer, of Pulaski, Va., for defendant.

PAUL, District Judge.

I am of opinion that the condition in the insurance policy providing that the insured shall maintain an approved watchman, time clock, and water gong, and the maintenance of which is made a consideration of the issuance of the policy, is an essential condition, compliance with which was necessary to the keeping of the policy in force.

The clause in the policy referred to reads: "In consideration of the reduced rate at which this policy is written, it is expressly stipulated and made a condition of this policy that the insured shall maintain, in so far as it is under his control or supervision, approved watchman and clock and approved outside water motor gong, operated by a sprinkler alarm."

While the word "warranty" is not used, the very text of the provision is such as to indicate that it was regarded as an absolute condition which the insured undertook to perform throughout the life of the policy; and that upon his agreement to comply with this condition, the premium was fixed and the policy was issued.

The fact that the terms "approved watchman," "clock," and "water gong" are not definite in setting forth exactly what the insured

should do, does not, in my opinion, lessen the effect of the condition; but it only introduces a difficulty in establishing what nature of service is understood by these terms. The condition to maintain the service is, I think, binding and absolute; but there is, of course, some latitude in arriving at the definition of what is meant by the terms. It must be conceded that a watchman service of some substantial nature was meant.

██ It is contended that the character of service maintained throughout the life of the policy was substantially that which had been maintained in previous years and during the life of other policies written by the defendant, and of which this policy was a renewal; that the defendant had knowledge of the character of the service then maintained; and that by its acquiescence in and implied approval of the character of service maintained throughout those previous years, the defendant, in substance, waived its right to insist on a more extensive service than has been maintained or was maintained to the time of the damage sued for. In other words, that during the life of the policy sued on, the defendant had no right to expect any more extensive service than existed at the time the policy was written and of which it had full knowledge.

Following principles laid down in the case of Lumber Underwriters v. Rife, in 237 U. S. 605, 35 S. Ct. 717, 59 L. Ed. 1140, I think it must be held that the rights of the defendant under the policies issued in May and in September, 1931, and now sued on, are in no way affected by any knowledge which the defendant might have had as to the character of watchman service enforced during the life of the previous policy. That case holds that each policy of insurance, although a renewal of others, is to be treated as a new policy, and that the insurer, by consenting to the existence of certain conditions with regard thereto while one policy of insurance was in force, does not thereby waive any of these rights upon a renewal of that policy, but has a right to expect full compliance with the terms of the new contract. It seems to me, therefore, that we cannot consider any knowledge by the defendant or any action taken by it, or lack of action, prior to the issuance of the policy sued on. The latter policy was a new contract, and the rights of the parties must be determined with relation to it and as to what was done after it became in force. It appears that at the time the policy sued on was issued, the plaintiff here maintained a watchman service which included, so far as the storage building was concerned, regular visits to two of the watch stations in this building throughout the entire night, and as to the third of the stations in this building, visits for the first three hours of the night. It did not include any inspection of the interior of the building or visits to the watch stations therein on Sundays, holidays, or other days that the plant was not in operation.

██ We must assume that the inspector for the Southeastern Underwriters' Association was acquainted with these facts, due to his inspection of the recording dials in the watch clock, and that he was acquainted with these facts after the policy became in force and as late as January, 1932, a few months before the loss. Whether knowledge to this inspector, without further proof that it was brought home to the defendant, binds the defendant, may be an open question, which I do not think it now necessary to comment on. The fact remains that even after the inspector acquired this knowledge in January, 1932, the plaintiff, without informing the defendant and without the defendant being in any way in possession of the knowledge, discontinued all watchman service within the storage building. The service up until that time had not been complete and had not complied with what the defendant's witnesses have stated did constitute an approved watchman service; but beginning about February 24, 1932, the plaintiff discontinued this service altogether.

Our question then reverts to one of whether or not at the time of the loss the plaintiff was maintaining, in connection with the storage building where the loss occurred, any service that could fairly be stated to come within the provisions of the policy. Witnesses for the defendant have testified as to what the defendant considered an "approved watchman" service; and while the plaintiff does not give its version of the term, it is evident that the plaintiff had some notion as to what constituted approved watchman service, as shown by the fact that it voluntarily and without instruction did maintain clock stations within the storage building and that over a long period of time these were regularly visited for at least a part of the night and two of the three of them were regularly visited throughout the night.

Even if we suppose that the character of service maintained prior to February 24 could be fairly said to be an approved watchman service within the meaning of the policy, the question arises whether the plaintiff had the right to discontinue that service to the full extent of having no interior inspection of the building at all, and whether a service which

provided for no inspection of the interior of the building, no visits to the clock stations, and which relied entirely upon an outside gong, could be called an approved service within the terms of the policy.

Even if the inspector, who was acting in the interest of the defendant, had allowed the plaintiff to whittle away a part of what might be called a complete watchman service, did this permit the plaintiff itself, without giving notice to that effect, to do away with the balance of such service? I do not think so.

While there may be a difference of opinion as to what is to be an approved watchman service, there can be no difference in opinion that no service at all does not come within the terms of the policy; and there is no evidence at all to warrant the contention that the defendant company had any knowledge of the fact that prior to the loss, no visits were being made to any of the watch stations in the storage building and that it was at no time being entered by the watchman.

There is no material dispute in this case in the evidence. What was done and was not done by either party appears to be rather clearly established. This being the case, it seems to be necessary that the court should determine the legal effect of the facts here proved; and upon these facts, I am forced to say that, in my opinion, no watchman service within the terms of the policy was maintained in the storage building at the time of the loss or for approximately a month previous thereto. Even if we say that the more or less imperfect service maintained prior to that time had been approved by the defendant, there is nothing to show that it approved any lesser degree of service or consented to the maintenance of no service at all.

 I have thought it improper to allow testimony to the effect that the property was as well protected without the service as it would have been with it, for that would be to substitute the judgment of outside persons for the agreement of the parties. Where the facts are not in dispute, I do not think the jury should be permitted to put its interpretation upon the legal effect or legal result of those facts, nor should I run the risk of having the jury say that an approved watchman service was maintained when, in the opinion of the court, by every proper construction of the terms of the contract and of the law applicable thereto, none such was maintained.

With my present feeling, I would be constrained to set aside any verdict which the jury might render in favor of the plaintiff;

and I think it is, therefore, proper that I should assume the responsibility of directing a verdict in favor of the defendant.

## On Motion to Set Aside Verdict.

At the trial of this case at the regular January term at Roanoke, a verdict for the defendant was rendered upon the instruction of the court. A motion to set aside the verdict was made and taken for further consideration, and has now been fully and ably argued.

The contention of the plaintiff that the court erred in directing a verdict against it and that the verdict should be set aside revolves largely around two points which were stressed in the argument:

1. That the clause in the policy providing for an approved watchman and clock and approved water motor gong was not a warranty, but merely a representation; that strict compliance therewith was not necessary and that substantial compliance was all that was required. That since the policy did not set forth definitely and specifically the nature, extent, and detail of the service to be maintained, the plaintiff had a right and was required to place its own interpretation upon the meaning of the policy, and to invoke its own judgment as to the nature and extent of the watchman service that was necessary for the protection of its property. That if the service maintained by the plaintiff was, as it thought, adequate and in substantial compliance with the policy, this was sufficient. And that there should have been submitted to the jury the question of whether there had been a substantial compliance with the clause of the policy relating to watchman service.

2. That the defendant had waived its right to deny liability because of an alleged breach of the watchman clause, for the reason that after the loss and with full knowledge of all facts, the defendant had promised to pay the loss insured against.

The first of these contentions was earnestly set forth by the plaintiff during the trial. It was involved in the question of the admissibility of certain evidence offered, and was relied on in the argument in opposition to an instructed verdict. It was, in fact, the contention upon which the whole case largely hinged.

Prior to instructing the verdict, the court read into the record its reasons for believing that such instructed verdict was proper. It stated its view of the law applicable to the case, and why it considered the position taken by the plaintiff untenable. Further and careful consideration has not caused me to alter

the views expressed at the time of the trial. And while the opinion then stated was not elaborate or detailed, I find, upon reference to what was then said, that there is little that I can add to it. It may be taken as setting forth the view which I now hold.

The second contention that the defendant had waived its right to deny liability on the policy because it had, subsequent to the loss, and with knowledge of the alleged breach, promised to pay the amount of the loss sustained, was also raised during the trial; but it has now been argued more fully than at that time.

It appears that on March 31, 1932, about a week after the loss, the defendant, by F. G. Tucker, its adjuster, and the plaintiff, by T. C. Coleman, its president, entered into an "Agreement as to Sound Value and Loss or Damage," the effect of which was to stipulate or agree upon the amount of loss suffered by the plaintiff, but with the express understanding that no liability was fixed thereby and that no conditions or provisions of the policy were waived. The purpose of such agreement seems to be to permit the parties to agree upon the amount of the loss suffered by the insured at a time when the evidence of that loss is freshly before them; at the same time reserving to the insurer its right to deny liability on the contract should investigations develop that for any reason it is not liable.

The policy provided that any loss for which the defendant might be liable should be payable sixty days after proof of loss was received and ascertainment of the loss had been made. After signing the agreement of March 31, 1932, fixing the amount of loss, the plaintiff heard nothing more from the defendant company until in June. On June 3, 1932, the president of the plaintiff corporation wrote to the defendant at its home office in New York, calling attention to the fact that more than sixty days had elapsed since the conference with the adjuster and asking that a check be sent covering the amount of the agreed loss. Some five or six days thereafter the plaintiff received through the mails a post card. This card was a form card used in acknowledging receipts of proofs of loss. Most of the matter thereon was printed, there being blank spaces for the insertion of policy number, dates, names, etc. The contents of this card were as follows (the words italicized were written with pen and ink, the words in capital letters were made with a rubber stamp, and the remaining matter was printed):

"THE HOME INS. CO. Insurance Co.

"59 Maiden Lane
"Telephone John 4—5800
"New York.....June 7, 1932.....19—
"Dear Sir:
"We are in receipt of your ~~notice of~~ *letter in relation to* loss under policy No. *951–967 Coleman Furniture,* assured, which occurred on *Mch. 25, 32* and the same has been referred *Herbert C. Taylor, State Agent, American Nat'l Bank Bldg., Richmond, Va.*
"Yours Truly
"THE HOME INS. CO. Insurance Co.

*"He will issue draft in payment of loss."*

The signature to this card (THE HOME INS. CO.) is by rubber stamp. The matter written on the lower left-hand corner of the card is with pen and ink, but with no signature or initials to show who actually prepared or mailed the card.

On June 29, 1932, after the receipt of this card, the plaintiff was called upon by Mr. Taylor, state agent of the defendant company, in person, and was informed that the company would contest liability on the policy.

The plaintiff contends that this card contains a positive and unconditional promise to pay the amount of the loss, made with full knowledge of the breach of contract upon which the defendant now relies; and that, having made such promise, the defendant has waived its right to rely on such breach.

It appears from the evidence of Herbert C. Taylor, referred to as the state agent for the defendant, that he "supervises the operations of the company's business in the State of Virginia." He states that the payment of the loss in question was entirely in his hands, that he issues drafts in payment of losses in the state of Virginia, and that no payment is ever made except by him. That several weeks after this loss he went in person to plaintiff's factory in the course of investigation as to the cause of the loss and there talked with Mr. Coleman, president of the plaintiff company, and obtained certain information from him. He further states that on June 7, 1932, when the post card was sent to the plaintiff in response to Mr. Coleman's letter asking payment of the loss, the loss had not been approved for payment by him (Taylor) and had not been approved by the home office for any payment by him, and he had not been instructed to pay the loss and was not so instructed at any time. That all "contact" which the plaintiff had as to payment of the

loss was with him (Taylor) and all correspondence had been with him, and that Mr. Coleman knew that he (Taylor) had charge of the loss at the time Coleman wrote to the home office on June 3, 1932. That some time (the date not determined) after his visit of investigation to the factory in April, Mr. Coleman had 'phoned him about payment of the loss and had been told by Taylor that he was "still investigating" and wanted to investigate further before deciding whether the defendant was liable. That on June 29, 1932, he (Taylor) again visited Mr. Coleman and told the latter that the company denied liability on the policy. The inference from Taylor's testimony is that, until this latter visit on June 29th, he had no knowledge of the post card sent from the home office on June 7th; although this does not clearly appear.

There seems no doubt that all information relating to the alleged breach of the policy, now relied on as a defense, was in possession of representatives of the defendant company prior to June 7th, the date when the post card was mailed. When the post card was sent, they had full knowledge of the conditions which are now invoked as a defense.

It is an accepted principle that an insurance company which has, with full knowledge of a breach of a condition of the policy, promised to pay an admitted loss, will be deemed to have waived its right to rely on the breach. But the application of this principle must not overlook other considerations which enter into the law of waiver and estoppel; and those considerations are no different when applied to a promise to pay a loss than when applied to other actions by the insurer relating to other aspects of the contract. There is sound authority for and much force in the view that the insurer is not estopped unless the insured relied upon the action of the insurance company and that his situation has been changed as a result thereof, and that it would operate as a fraud upon him to allow the insurer to retract or disown its previous conduct.

See Globe Mut. Life Insurance Co. v. Wolff, 95 U. S. 326, 333, 24 L. Ed. 387, where it is said: "The doctrine of waiver, as asserted against insurance companies to avoid the strict enforcement of conditions contained in their policies, is only another name for the doctrine of estoppel. It can only be invoked where the conduct of the companies has been such as to induce action in reliance upon it, and where it would operate as a fraud upon the assured if they were afterwards allowed to disavow their conduct and enforce the conditions."

In Lewin v. Telluride Iron Works Co. (C. C. A. 8th Cir.) 272 F. 590, page 598, it is stated that among the indispensable elements of estoppel are the following: "a representation by the party estopped which misleads" and "an innocent and detrimental change of the party asserting the estoppel in reliance upon the representation."

In the case of Joye v. South Carolina Mut. Ins. Co., 54 S. C. 371, 32 S. E. 446, 447, there seems to have been raised the exact question here involved, where it was contended that a letter written by the president of the insurance company, promising payment of the claim, constituted a waiver of a condition of the breach of which he had knowledge. The court, upholding a directed verdict for the company, said in part: "Again, it was suggested that the president of the company, by his letter to her, dated April 22, 1898, had stated her claim would be paid, and thereby there was a waiver of the right to regard her policy as vitiated by her own act of failing to pay the assessments before the loss by fire. It is quite true, such a letter was written, but it was followed by one some time afterwards, denying all liability. There was no proof that any change in the condition of plaintiff had been the result of the first letter of the president."

In the case of Phœnix Ins. Co. v. Lawrence, 4 Metc. (Ky.) 9, 81 Am. Dec. 521, the same situation arose, and the lower court instructed the jury that if the company's agent, having authority to adjust and pay losses, with knowledge of a breach of a condition of the policy, promised to pay the loss, the verdict should be for the plaintiff. In holding this erroneous, the appellate court says, in part: "Conceding the most ample authority to the agent to bind the defendant, yet, if the policy was void at the time of the fire, there was no consideration for the promise to pay the loss."

In other words, in order that the waiver by an insurance company of a breach of the policy may be invoked to estop its denial of liability, there must have been some consideration for the waiver in the form of continued business or otherwise, or the insured must have so far acted in reliance upon the conduct of the company as that it would be inequitable to permit the company to disavow its action.

Nothing of the sort exists in the present case. Mr. Coleman, president of the plaintiff company, had talked with Mr. Taylor, the

state agent, with regard to the loss a few weeks after the loss occurred. He knew that some investigation was being made concerning the loss; and, so far as the evidence discloses, knew that Mr. Taylor was handling the question of this loss. After waiting for some time, Mr. Coleman wrote, not to the man with whom he had had his previous negotiations, but to the home office of the company in New York, requesting payment of the amount of the loss. In response to this letter, he received a form post card stating that the matter had been referred to Mr. Taylor, the state agent at Richmond, Va., the very man with whom he had already been negotiating and who he knew was in charge of the settlement.

In the lower left-hand margin of this same post card there was written in ink the words, "He will issue draft in payment of loss." The post card was signed with the name of the defendant by a rubber stamp. No attempt has been made to show that this post card was sent by or with the knowledge of any responsible officer of the defendant having authority to make promise of payment; and while it does bear the signature of the defendant in the form stated above, it was quite apparently sent as a matter of routine, and most probably by some clerk in the office, who appended the words written in ink. Indeed, the language of the words alleged to be a promise to pay may be taken to mean simply that Mr. Taylor, the person to whom the claim had been referred, was the person who would issue a draft when the claim was paid. It might simply have been meant to inform Mr. Coleman that any payment to be made would come from the Richmond office and not have been meant to state that the company, after investigation, had decided to and would pay this claim. The indications are that the notation on this post card was due to the mere inadvertence of some clerk in the home office, who made an unhappy choice of words without any real knowledge of the status of the claim which was being entirely handled by the state agent in Richmond.

It may be said that if this is the case, it was incumbent upon the defendant to show these facts and that the plaintiff is entitled to rely upon the statements made in this communication. This may be true, but there is no evidence that he placed any reliance on the post card unless it be merely that after its receipt, he did expect or hope that the loss would be paid. There is no evidence, and no claim is made, that the receipt of this card or his expectation that the claim would be paid in any way altered his situation to his disadvantage or affected him in any way whatever, and which made it inequitable that the company should have, a few weeks later, refused to pay the loss.

Under all of these circumstances, I am of opinion that it would be going far afield to hold that the defendant is now estopped to deny liability on the policy because of the alleged promise to pay contained on the post card in question. After full consideration of the questions raised at the trial and upon the motion to set aside the verdict which was then directed in favor of the defendant, I am of the conclusion that no error was made in directing the verdict; and the motion to set it aside will be overruled.